1 Fennemore Craig, P.C.
Anthony W. Austin (No. 025351)
2 Justin R. DePaul (No. 031581)
2394 East Camelback Road, Suite 600
3 Phoenix, AZ 85016-3429
Telephone: (602) 916-5000
4 Email: aaustin@fclaw.com

5 Attorneys for Debtor Tanga.com, LLC

6

7

8                        IN THE UNITED STATES BANKRUPTCY COURT

9                            FOR THE DISTRICT OF ARIZONA

10 In re                                      Case No. 2:18-bk-06314-BMW

11 TANGA.COM, LLC,                            Chapter 11

12            Debtor.                          **MOTION FOR INTERIM AND FINAL
                                              ORDERS (I) AUTHORIZING DEBTOR TO
13                                            OBTAIN POST-PETITION SECURED
                                              FINANCING AND (II) GRANTING
14                                            SECURITY INTERESTS AND LIENS**

15

16        Tanga.com, LLC, the debtor and debtor in possession (the "**Debtor**") in the above-

17 captioned bankruptcy case (the "**Case**"), hereby submits this motion (the "**Motion**") seeking entry

18 of interim and final orders, as applicable: (1) authorizing the Debtor to obtain a post-petition loan

19 totaling $100,000 (60% on an interim basis and 40% on a final basis) (the "**DIP Loan**") from ZR

20 Ventures, LLC (collectively, with its successors and assigns, the "**DIP Lender**"); (2) granting

21 super-priority administrative status and a lien on substantially all of the Debtor's assets to the DIP

22 Lender; and (3) granting certain related relief under sections 362, 363(c)(1), 364(c), 503(b),

23 507(b), 1107, and 1108 of title 11 of the United States Code (as amended, the "**Code**"), and Rules

24 2002, 4001(b), (c) and (d), 6004(h), and 9014 of the Federal Rules of Bankruptcy Procedure (the

25 "**Rules**") and Local Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the

26 United States Bankruptcy Court for the District of Arizona (the "**Local Rules**").

FENNEMORE CRAIG, P.C.

PHOENIX

14000285.2

1    Such relief includes approval of the *Secured Promissory Note* and *Security Agreement*

2    (together, the "**DIP Loan Documents**"). The Debtor is not seeking priming liens (it has no pre-

3    petition secured lender) and is not granting any liens on Chapter 5 causes of action.

4    This Motion is supported by the following Memorandum of Points and Authorities, the

5    *Declaration of Jeremy Young* (the "**Young Declaration**"), the facts and law averred in this

6    Motion and the supporting Memorandum, and the entire record before the Court in the Case.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

9    By the Motion, the Debtor seeks entry of an interim order, substantially in the form

10   attached as <u>Exhibit A</u> hereto (the "**Interim Order**"): (a) authorizing the Debtor to incur post-

11   petition financing, including granting super-priority administrative expense status and a lien on

12   substantially all of the Debtor's assets under §§ 364(c), 364(d), 503(b), 507(b), 1107, and 1108,

13   on an interim basis; (b) scheduling a final hearing (the "**Final Hearing**") on the Motion to

14   consider entry of a final order (the "**Final Order**") which authorizes the Debtor to incur post-

15   petition financing, including granting super-priority administrative expense status and a lien on

16   substantially all of the Debtor's assets under §§ 364(c), 364(d), 503(b), 507(b), 1107, and 1108,

17   on an final basis; and (c) granting certain related relief.

## II. JURISDICTION AND VENUE

19   The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is

20   a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this district pursuant to

21   28 U.S.C. §§ 1408 and 1409.

22   The bases for the relief requested herein are Code §§ 105, 361, 362, 363(c)(2), 364(c)(1),

23   364(c)(2), 364(c)(3), 364(d)(1), and 364(e); Rules 2002, 4001, and 9014; and Rule 4001-4 of the

24   Local Rules of Bankruptcy Procedure for the District of Arizona (the "Local Rules").

25   No previous application for the relief sought herein has been made to this or any other

26   court.

# III.  SPECIAL NOTICES UNDER LOCAL RULE 4001-4

Even though this Motion has not been filed on the Petition Date with the other "First Day Motions," pursuant to Local Rule 4001-4(a), the Debtor provided an advance courtesy copy of this Motion to the Office of the United States Trustee (the "U.S. Trustee") in advance of filing the Motion.

In accordance with the disclosure requirements of Rules 4001(b)-(d) and Local Rule 4001-4(b), the material terms of the DIP Loan Documents are summarized below.[1]

| Provision | Description |
|---|---|
| **Borrower** | Tanga.com, LLC |
| **DIP Lender** | ZR Ventures, LLC, a Delaware limited liability company. |
| **DIP Loan** | A senior secured post-petition term loan of $100,000, of which 60% (or $60,000.00) will be funded upon entry of the Interim Order; and the remaining 40% (or $40,000.00) will be funded upon entry of a Final Order. |
| **Interest-Only Payments** | The Debtor will make interest-only payments of $1,000 to the DIP Lender until the Maturity Date. [2] |
| **Maturity Date** | The term of the DIP Loan is seven (7) months and commences upon entry of the Interim Order through the earliest to occur of (a) seven (7) months from the date upon which the Interim Order was entered, (b) an event of default as defined in the DIP Loan Documents, (c) ten days after the occurrence of the effective date of any Plan, (d) the Final Order is not entered within thirty days after filing of the Motion unless otherwise agreed in writing by the DIP Lender; or (e) ten days after the closing date of the sale of substantially all of the Borrower's assets (the earliest to occur is the "**Termination Date**"). |
| **Interest Rate** | In the absence of an Event of Default (described below and defined in the Interim Order, a fixed rate of twelve percent (12%) per annum; from and after the occurrence of an event of default, a fixed rate of eighteen percent (18%) per annum. |

---

[1] The following informational summary is intended only for summary purposes and is qualified in its entirety by the provisions of the DIP Loan Documents, attached as Exhibit 1 to the Interim Order. Capitalized terms not otherwise defined in this Summary have the meaning ascribed to those terms in the DIP Loan Documents.

[2] Capitalized terms not otherwise defined in this summary have the meanings ascribed to those terms in the DIP Loan Documents.

FENNEMORE CRAIG, P.C.

PHOENIX

14000285.2

| Provision | Description |
|---|---|
| **Fees** | The Debtor shall reimburse DIP Lender all of its reasonable and necessary fees and expenses, including, without limitation, attorneys' fees and expenses ("**DIP Lender Expenses**"). The DIP Lender Expenses shall be added to the principal amount of the DIP Loan and paid in full at maturity. |
| **Use of Cash Collateral/ Budget** | Debtor is authorized to use the DIP Lender's cash collateral, in accordance with the Budget, as attached to the DIP Loan Documents, subject to a ten (10%) adversarial change. The Budget shall be updated on a monthly basis. |
| **Super-priority Claims and DIP Liens** | <u>Super-priority Claims</u>. The DIP Obligations will constitute allowed super-priority administrative claims under Code § 364(c)(1) against the Debtor with priority over all administrative expenses, diminution claims, and all other claims against the Debtor, including all administrative expenses specified in §§ 503(b) and 507(b) and any claims arising under Code §§ 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 546(c), 726, 1113, or 1114, payable from all the Debtor's prepetition and post-petition property and all proceeds thereof; <u>provided</u>, <u>however</u>, that the super-priority claims are not payable from the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code.<br><br><u>DIP Liens.</u> Pursuant to Code § 364(c)(2), as security for the extension of the DIP Loan, effective and perfected on entry of the Interim Order and without the execution or recordation of any security agreement, pledge, financing statement, or other similar document, though the same may be required by DIP Lender, the Debtor grants a valid, binding, continuing, enforceable, perfected first-priority lien on all of the Debtor's unencumbered property, except avoidance actions under chapter 5 of the Code, if any. |
| **Sale of DIP Collateral and Credit Bid Rights** | Debtor shall not sell, assign (by operation of law or otherwise) or otherwise dispose of any of the DIP Collateral (defined below) without approval from the Bankruptcy Court, except in the ordinary course of business pursuant to Rule 6004, in which case such DIP Collateral shall be free and clear of the DIP Lender's security interest. In the event the Bankruptcy Court approves a sale not in Debtor's ordinary course of business, the DIP Lender may credit bid for the then-balance of the DIP Loan. Should the resulting sale price exceed the balance of the DIP Loan, the DIP Collateral shall be sold free and clear of DIP Lender's security interest, with said security interest attaching to the sale proceeds upon closing of the sale transaction. |

| Provision | Description |
|---|---|
| **Events of Default** | The occurrence or existence of any one or more of the following events or conditions, whether voluntary or involuntary, constitute an Event of Default:<br><br>(a)    Debtor fails to pay when due (whether due at stated maturity, upon acceleration, or as otherwise provided herein) any installment of principal, over advance, or interest on the DIP Loan, or otherwise owing under the DIP Loan Documents;<br><br>(b)    Debtor fails to pay any of its other obligations on the due date thereof (whether due at stated maturity, upon acceleration, or as otherwise provided herein) and such failure shall continue for a period of ten days after DIP Lender's giving Debtor written notice thereof;<br><br>(c)    Debtor fails to perform, keep, or observe any covenant contained in any DIP Loan Documents and the breach is not cured within ten days after Debtor's receipt of notice of such breach from DIP Lender;<br><br>(d)    any representation or warranty made by or on behalf of Debtor, or other information provided by or on behalf of Debtor to DIP Lender, was incorrect or misleading in any material respect at the time it was made or provided;<br><br>(e)    any DIP Loan Document is terminated other than as provided for in the DIP Loan Documents or becomes void or unenforceable, or any security interest or lien ceases to be a valid and perfected first-priority security interest in or lien on any portion of the DIP Collateral;<br><br>(f)    a trustee or examiner with expanded powers is appointed in the Case and the order appointing such trustee, responsible officer, or examiner shall not have been stayed, reversed, or vacated within thirty days after the entry thereof;<br><br>(g)    the dismissal of the Case, or the conversion of the Case from one under chapter 11 to one under chapter 7 of the Bankruptcy Code;<br><br>(k)    the entry of an Order by the Bankruptcy Court granting relief from or modifying the automatic stay of Code § 362(a) with respect to any claim or property with a value exceeding $50,000;<br><br>(l)    an order is entered by the Bankruptcy Court approving a sale of the Debtor or any DIP Collateral (other than the sale of |

Fennemore Craig, P.C.

Phoenix

14000285.2

| Provision | Description |
|---|---|
| | Inventory in the ordinary course of business) on terms to which DIP Lender has not given its prior written consent, unless such motion provides for immediate repayment in cash of all obligations and indebtedness under the DIP Loan Documents; and/or |
| | (m) without DIP Lender's written consent, the Debtor's actual cumulative disbursements exceeds the projected monthly disbursements in the Budget by more than 10% in any month. |

## IV. **PROCEDURAL BACKGROUND**

On June 1, 2018 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the Code. The Debtor continues to operate its businesses and manage its assets as debtor in possession in accordance with Code §§ 1107 and 1108. No trustee, examiner, or official committee of unsecured creditors has been appointed in the Case.

The Court has jurisdiction over the Case under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2). The Debtor's principal assets are located in Phoenix, Maricopa County, Arizona. Accordingly, venue is proper under 28 U.S.C. §§ 1408 and 1409 and Local Rule 1071-1(c).

## V. **FACTS**

### A. **Background Specific to the Motion**

To correct the financial concerns that resulted in the Debtor seeking bankruptcy protection, the Debtor instituted substantial cost saving measures, including workforce reductions and vacating its leased facilities. The Debtor also began to address its vendor relationships. It identified those vendors with which it generated a substantial margin on the sale of goods and with whom it did a high volume of sales. By identifying these high-margin vendors, the Debtor has been able to begin rebuilding its revenue base while utilizing fewer vendors. However, the

process of bringing on new vendors that will work with the Debtor and can generate higher margins will take time, and the Debtor needs funds to continue operating in the meantime. In addition, as a result of the freeze placed on Debtor's receivables by PayPal/Braintree, Debtor has been deprived of nearly a week of cash flow and other monies. Accordingly, an infusion of cash in the form of the DIP Loan is necessary to stabilize operations. Despite its diligent efforts, the Debtor has been unable to obtain financing in the form of unsecured credit allowable under Code § 503(b)(1) as an administrative expense or solely in exchange for the grant of a special administrative expense priority pursuant to Code § 364(c)(1). To prevent immediate and irreparable harm, the Debtor can obtain financing in the amounts required only by the grant of liens secured by a lien on property of the estate that is not otherwise subject to a lien under Code § 364(c)(2), but the Debtor has been unable to procure such financing from any source other than the DIP Lender.

The Debtor was formerly affiliated with the members of the DIP Lender, who are also members of Discount Magazines, LLC ("**DM**"), a creditor of the bankruptcy estate and party to a technical services agreement with the Debtor that is essential to the Debtor's continued operations. DM and the Debtor were formerly subsidiaries of EY Holdings, LLC. Although DM is no longer a subsidiary of EY Holdings, LLC, DM continues to do business with the Debtor.

The DIP Lender is willing to provide the DIP Loan to the Debtor on the condition that, as security for the prompt payment of the DIP Loan, including principal, interest, fees, costs, expenses (including reasonable attorneys' fees), and other charges at any time payable by Debtor under the DIP Loan Documents (whether the foregoing are incurred by the Debtor through cash advances or payment in-kind), the DIP Lender shall receive a first-position senior security interest in and blanket lien on (the "**DIP Lien**") all of Debtor's property and assets (tangible, intangible, real, personal, and mixed), whether in existence on or before the Petition Date or created, acquired, or arising on or after the Petition Date and wherever located, including, without limitation, accounts, cash, deposit accounts, inventory, equipment, investment property,

instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks, domain names, customer lists, software, source code, websites, and all other assets related to or associated with e-commerce, causes of action, insurance, general intangibles, and all products and proceeds (including insurance proceeds) thereof (all such tangible, intangible, real and personal property, and the proceeds thereof, being collectively referred to hereinafter as the "**DIP Collateral**"), excluding any avoidance actions under Chapter 5 of the Code and any amounts that are recovered or otherwise received by the Debtor in respect of avoidance actions. The DIP Lender shall also receive a super-priority administrative claim as set forth above.

The Debtor, working with its financial advisor, has developed a Budget, which is attached to the Interim Order as <u>Exhibit 2</u>.  The Debtor and the DIP Lender have agreed that the Debtor may use the proceeds of the DIP Loan to fund its operations in accordance with the Budget.  The Debtor and its financial advisor, in consultation with and with the agreement of the DIP Lender, will revise the Budget monthly and provide the DIP Lender with financial information as set forth in the DIP Loan Documents.

## VI. <u>BASIS FOR RELIEF REQUESTED</u>

As set forth in detail above, the Debtor needs post-petition financing to sustain its operations, and **DIP Loan** is the only financing available to the Debtor at this time.  Thus, based on the foregoing and for the reasons set forth below, the Debtor submits that it has satisfied the requirements to access post-petition financing on a super-priority secured basis under Code § 364.

### A.    <u>The Debtor Should Be Authorized to Obtain Post-petition Financing Under Code § 364.</u>

Under Code § 364(c), a court may authorize a debtor to incur debt that is (a) entitled to a super-priority administrative expense status; (b) secured by a lien on otherwise unencumbered property; or (c) secured by a junior lien on encumbered property if the debtor cannot obtain post-petition credit on an unsecured basis, on an administrative expense priority, or secured solely by

junior liens on the debtor's assets.  11 U.S.C. § 364(c); *In re Barbara K. Enters*, Inc., No. 08-11474 (MG), 2008 WL 2439649, at *8 (Bankr. S.D.N.Y. June 16, 2008) (in order for a debtor to obtain post-petition secured credit under Code § 364, the debtor must prove that it was unable to reasonably obtain secure credit elsewhere); *Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp*., 266 B.R. 575, 584 (S.D.N.Y. 2001) (super-priority administrative expenses authorized where debtor could not obtain credit as an administrative expense).

Courts consider whether the post-petition financing:  (a) is necessary to preserve the assets of the estate and is necessary, essential, and appropriate for continued operation of the debtor's business; (b) is in the best interests of the debtor's creditors and estates; (c) is an exercise of the debtor's sound and reasonable business judgment; (d) was negotiated in good faith and at arm's length between the debtor, on the one hand, and the lender on the other; and (e) contains terms that are fair, reasonable, and adequate, given the circumstances of the debtor and the proposed post-petition lender.  *See In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003); *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. Feb. 27, 2009); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990).

Here, the Debtor proposes to obtain the DIP Loan by providing the DIP Lender, among other things, super-priority claims, security interests, and liens pursuant to Code §§ 364(c)(1)-(2) and 364(d).  The Debtor submits that entry into the DIP Loan Documents satisfies these factors.

      **1.**     **The DIP Financing was negotiated in good faith, is in the best interests of the Debtor's creditors and estate, is necessary to preserve assets, and is an exercise of the Debtor's sound and reasonable business judgment.**

A debtor's decision to enter into a post-petition lending facility under Code § 364 is governed by the business judgment standard.  *See Barbara K. Enters.*, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment); *Ames Dep't Stores*, 115 B.R. at 38 (noting that financing decisions under Code § 364 must reflect a debtor's business judgment).  Courts grant a debtor considerable deference in acting in

accordance with its sound business judgment. *See, e.g., Barbara K. Enters*., 2008 WL 2439649, at *14 (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest.").

Specifically, to determine whether the business judgment standard is met, a court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at *272 (Bankr. D. Del. Aug. 15, 2007) (quoting *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006)); *In re Brooklyn Hosp. Ctr. and Caledonian Health Ctr., Inc.*, 341 B.R. 405, 410 (Bankr. E.D.N.Y. 2006) (the business judgment rule "is a presumption that in making a business decision, the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company") *quoting Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992).

The Debtor's decision to enter into the proposed DIP Loan Documents is well within the exercise of its sound business judgment. Approval of the DIP Loan will provide the Debtor with immediate access to cash to pay its current and ongoing post-petition operating expenses. Unless the operating expenses are paid in the interim, the Debtor may be forced to cease operations, which would likely (a) result in irreparable harm to its businesses, (b) diminish the Debtor's going concern value, and (c) jeopardize the Debtor's ability to maximize the value of its estate to the detriment of its creditors, members, and employees. With the DIP Loan, the Debtor will be able to continue to satisfy its vendors, service its customers, pay its employees, and operate its businesses in an orderly and reasonable manner to preserve and enhance the value of its estate for the benefit of all parties in interest. Accordingly, the timely approval of the relief requested herein is imperative.

FENNEMORE CRAIG, P.C.

PHOENIX

14000285.2

Prior to the Petition Date, the Debtor attempted to locate alternative financing to address its liquidity needs. Notwithstanding its efforts, the Debtor has been unable to procure sufficient financing in the form of unsecured credit allowable under Code § 503(b)(1) as an administrative expense under Code § 364(a) or (b), absent an exchange for the grant of a super-priority administrative expense claim pursuant to Code § 364(c)(1).

For these reasons, the Debtor submits that the DIP Loan Documents were negotiated in good faith, and that entry into the DIP Loan Documents to obtain the DIP Loan is in the best interests of the Debtor's creditors, is necessary to preserve the value of estate assets, and is within the exercise of the Debtor's sound and reasonable business judgment.

> **2. The terms of the DIP Loan Documents are fair, reasonable, and appropriate in light of the Debtors' needs and the current market environment.**

It is well recognized that the appropriateness of a proposed post-petition financing facility must be considered in light of current market conditions. *In re Lyondell Chem. Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. Feb. 27, 2009); *Bray v. Shenandoah Fed. Savs. & Loan Assoc. (In re Snowshoe Co. Inc.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (noting that a debtor is not required to seek credit from every possible lender before determining such credit is unavailable). Indeed, courts often recognize that, where there are few lenders likely able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [a debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd*, 99 B.R. 117 (N.D. Ga. 1989). Rather, a debtor must demonstrate that it made a reasonable effort to seek credit from other sources available under Code §§ 364(a) and (b). *See Snowshoe*, 789 F.2d at 1088.

Though the current market for financing has improved in recent years, it is still strained in certain distressed industries. In the e-commerce space, there is a limited market for financing, including debtor-in-possession financing or otherwise, and provisions once considered "extraordinary" in debtor in possession financing arrangements have, for the time being, become

standard. Fortunately, such "extraordinary" provisions are not present in the DIP Loan Documents. For example, there are no financing fees or premiums in the DIP Loan Documents. Accordingly, the Debtor believes that the DIP Loan terms are favorable, fair, and appropriate.

**B.**     **The DIP Loan Documents Were Negotiated in Good Faith and the DIP Lender Should Be Afforded the Protection of Code § 364(e).**

Code § 364(e) protects a good faith lender's right to collect on loans extended to a debtor and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Specifically, Code § 364(e) provides that any "reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith . . . ." 11 U.S.C. § 364(e).

Courts generally hold that "good faith" in the context of post-petition financing means, consistent with the Uniform Commercial Code, honesty in fact in the conduct or transaction concerned. *See Unsecured Creditors' Comm. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 834 F.2d 599, 605 (6th Cir. 1987) (citing U.C.C. § 1-201(19)). Additionally, good faith is measured with respect to the good faith of the lender as contrasted to that of the borrower. *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. Feb. 27, 2009). Moreover, a lender's desire to ensure that it is repaid, to make money on interest and fees, and to protect prepetition positions are understandable and acceptable motivations for a post-petition lender in negotiating a deal. *Id*. at 737.

The terms of the DIP Loan Documents were negotiated in good faith and at arm's length between the Debtor and the DIP Lender, and all of the DIP Loan obligations will be extended by the DIP Lender in good faith (as such term is used in Code § 364(e)). No consideration is being provided to any party to the obligations arising under the DIP Loan Documents, other than as set forth herein. Moreover, the DIP Loan has been extended in express reliance upon the protections

offered by Code § 364(e), and the DIP Lender should be entitled to the full protection of Code § 364(e) in the event that either of the orders granting the Motion (or any provision thereof) are vacated, reversed, modified on appeal, or otherwise.

**C.**    **Modification of the Automatic Stay Is Appropriate Under the Circumstances.**

Paragraph ___ of the Interim Order requires that the automatic stay imposed under Code § 362 be modified as necessary to permit the Lender to (i) implement the DIP Loan, (ii) take any act to create, validate, evidence, or perfect any lien granted or authorized under this Interim Order (although nothing in the Interim Order requires any such act), and, among other things, (iii) to charge, collect, advance, and receive payments under the DIP Loan.

Stay modification provisions of this sort are ordinary and usual features of debtor-in-possession financing facilities and, in the Debtor's business judgment, are reasonable under the present circumstances. *See, e.g., In re Innkeepers USA Trust*, Case No. 10-13800 (Bankr. S.D.N.Y. Sept. 2, 2010). Accordingly, the Court should modify the automatic stay to the extent contemplated by the Debtor and the Lender.

**D.**    **The Court Should Grant Interim Approval.**

Bankruptcy Rule 4001 permits a court to approve a debtor's request for financing on an interim basis following the filing of a motion requesting authorization to obtain financing, "only . . . as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Bankruptcy Rule 4001. In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. *See, e.g, Simasko*, 47 B.R. at 449; *see also Ames*, 115 B.R. at 38.

Pursuant to Bankruptcy Rules 4001(b) and (c), the Debtor requests that the Court conduct an expedited preliminary hearing on this Motion and authorize the Debtor to borrow up to $60,000, pending entry of the Final Order, at which time the Debtor is authorized to borrow the

remaining balance of $40,000, to maintain and finance the ongoing operations of the Debtor and to avoid immediate and irreparable harm to the Debtor's estate and all parties in interest.

The Debtor has an urgent and immediate need for cash to continue to operate. As discussed above, absent authorization from the Bankruptcy Court to obtain secured credit, as requested, on an interim basis pending a final hearing on the Motion, the Debtor will be immediately and irreparably harmed. The availability of interim loan under the DIP Loan Documents will provide necessary assurance to the Debtor's vendors, employees, and customers of its ability to meet its near-term obligations. Failure to meet these obligations and to provide these assurances likely would have a significant negative impact on the value of the business, to the detriment of all parties-in-interest. Accordingly, the interim relief requested is critical to preserving and maintaining the going-concern value of the Debtor until entry of a final order on this Motion.

### E. <u>Request for Final Hearing</u>

Inasmuch as this Motion seeks interim and final relief in connection with the proposed DIP Financing, the Debtor further requests that the Court schedule the Final Hearing to consider entry of the Final Order that authorizes the Debtor to incur post-petition financing, including granting super-priority administrative expense status and a lien on substantially all of the Debtor's assets under §§ 364(c), 364(d), 503(b), 507(b), 1107, and 1108, on an final basis.

### VII. <u>WAIVER OF BANKRUPTCY RULE 6004(h)</u>

The Debtor further seeks a waiver of any stay of the effectiveness of the Interim Order and Final Order approving the Motion. Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." As set forth above, the DIP Financing is essential to prevent irreparable damage to the Debtor's business, value of its estate, and ability to conduct an orderly sale process. Accordingly, the Debtor

1  submits that ample cause exists to justify a waiver of the fourteen (14) day stay imposed by

2  Bankruptcy Rule 6004(h), to the extent that it applies.

### VIII. <u>RESERVATION OF RIGHTS</u>

4  Nothing contained herein is intended or should be construed as an admission as to the

5  validity of any claim against the Debtor, a waiver of the Debtor's rights to dispute any claim, or

6  an approval or assumption of any agreement, contract, or lease under Code § 365.  In addition, the

7  Debtor reserves the right to seek additional relief from this Court as relates to any of the relief

8  requested pursuant to the Motion.

### IX. <u>CONCLUSION</u>

10  **WHEREFORE**, the Debtor respectfully requests that the Court enter an order

11  substantially in the form attached as Exhibit A (a) authorizing the Debtor to incur post-petition

12  financing in the amount of $100,000 in accordance with the DIP Loan Documents, including

13  granting super-priority administrative expense status and a first-position security interest in and

14  lien on substantially all of the Debtor's assets, on an interim basis ($60,000 to be paid upon entry

15  of the Interim Order); (b) scheduling the Final Hearing on the Motion to consider entry of the

16  Final Order ($40,000 to be paid to the Debtor upon entry of the Final Order); and (c) granting

17  such other and further relief as the Court may deem appropriate.

18  DATED this 14th day of June, 2018.

19  FENNEMORE CRAIG, P.C.

20

21  By */s/ Anthony W. Austin*
        Anthony W. Austin
        Justin R. DePaul

22      Attorneys for Debtor Tanga.com, LLC

23

24

25

26

FENNEMORE CRAIG, P.C.

PHOENIX

14000285.2

15

Case 2:18-bk-06314-BMW    Doc 57    Filed 06/14/18    Entered 06/14/18 16:43:35    Desc
Main Document    Page 15 of 44

# EXHIBIT
# A

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| In re | Case No. 2:18-bk-06314-BMW |
|---|---|
| TANGA.COM, LLC, | Chapter 11 |
| Debtor. | **INTERIM ORDER GRANTING MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING POST-PETITION SECURED FINANCING** |

Upon the motion (DE#__) (the "**Motion**") by the debtor and debtor-in-possession (the "**Debtor**") in the above-captioned bankruptcy case ("**Case**"), seeking entry of interim and final orders (1) authorizing the Debtor to obtain a post-petition loan totaling $100,000 (60% on an interim basis and 40% on a final basis) (the "**DIP Loan**") from ZR Ventures, LLC (collectively, with its successors and assigns, the "**DIP Lender**"); (2) granting super-priority administrative status and a first-position security interest in and lien on substantially all of the Debtor's assets to the DIP Lender; and (3) granting certain related relief under sections 362, 363(c)(1), 364(c), 503(b), 507(b), 1107, and 1108 of title 11 of the United States Code (as amended, the "**Code**"), and Rules 2002, 4001(b), (c) and (d), 6004(h), and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Rules**") and Local Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Arizona (the "**Local Rules**"),

1  and upon the Court's consideration of the pleadings, the evidence presented and representations

2  made at the interim hearing held by the Court with regard to the relief requested in the Motion,

3  the statements of counsel, and after review of the *Secured Promissory Note* and *Security*

4  *Agreement* (together, the "**DIP Loan Documents**"), attached as <u>Exhibit 1</u> hereto, and the

5  *Declaration of Jeremy Young* (the "**Young Declaration**"), the Court hereby makes the following

6  findings of fact and conclusions of law:

7          1.      This Court has jurisdiction to entertain the Motion pursuant to 28 U.S.C. §§ 157

8  and 1334.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

9  Consideration of the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).    The

10  statutory predicates for the relief requested herein are Code §§ 105, 362, 363, and 364 and Rules

11  4001(c) and 9014.

12          2.      On June 1, 2018 ("**Petition Date**"), the Debtor filed a voluntary petition for relief

13  under Chapter 11 of the Bankruptcy Code.    The Debtor is managing its properties and operating

14  its businesses as a debtor-in-possession pursuant to Code §§ 1107 and 1108.    No trustee or

15  examiner has been appointed in this bankruptcy case, and an official committee of unsecured

16  creditors has not been appointed at this time.

17          3.      The Debtor has an immediate and ongoing need to obtain financing of the type

18  requested in the Motion to satisfy its current and ongoing post-petition operating expenses.

19          4.      Authority to obtain financing from the DIP Lender is necessary for the Debtor to

20  continue the operation of its business as a debtor-in-possession and to preserve the going-concern

21  value of its assets.    Unless the operating expenses are paid in the interim, the Debtor may be

22  forced to cease operations, which would likely (a) result in irreparable harm to its businesses, (b)

23  diminish the Debtor's going concern value, and (c) jeopardize the Debtor's ability to maximize

24  the value of its estate to the detriment of its creditors, members, and employees.    With the DIP

25  Loan, the Debtor will be able to continue to satisfy its vendors, service its customers, pay its

26

1   employees, and operate its businesses in an orderly and reasonable manner to preserve and

2   enhance the value of its estate for the benefit of all parties in interest.

3       5.      The Debtor will suffer immediate and irreparable harm unless it is immediately

4   authorized to obtain DIP Financing in the amount and on the terms and conditions set forth in this

5   Interim Order and in the DIP Loan Documents.  Despite diligent efforts, the Debtor has been

6   unable to obtain financing in the form of unsecured credit allowable under Code § 503(b)(1) as an

7   administrative expense or solely in exchange for the grant of a super-priority administrative

8   expense basis pursuant to Code § 364(c)(1).

9       6.      Subject to the terms and conditions set forth in this Interim Order, the DIP Lender

10  is willing to extend to the Debtor on an interim basis up to $100,000, $60,000 upon entry of this

11  Interim Order and the remaining $40,000 upon entry of a Final Order.

12      7.      The DIP Lender is willing to provide post-petition financing to the Debtor to

13  provide working capital to the Debtor during the Chapter 11 Case.  A condition to the willingness

14  of the DIP Lender to fund the DIP Loan is that, as security for the prompt payment and

15  performance of the DIP Loan and all interest, fees, expenses, and charges at any time payable by

16  the Debtor under this Interim Order and the DIP Loan Documents, the Court grant the DIP

17  Lender the protections set forth in the DIP Loan Documents, including, without limitation[1]—

18          a.  Senior security interests and a perfected first-position lien in all of the Debtor's

19              presently-owned and after-acquired assets pursuant to Code §§ 364(d) and (c),

20              including a first-position senior security interest in and lien on (the "**DIP Lien**")

21              all of the Debtor's property and assets (tangible, intangible, real, personal, and

22              mixed), whether in existence on or before the Petition Date or created, acquired, or

23              arising on or after the Petition Date and wherever located, including, without

24              limitation, accounts, cash, deposit accounts, inventory, equipment, investment

25              property, instruments, chattel paper, real estate, leasehold interests, contracts,

---

[1] To the extent of any conflict, the terms of the Interim Order will control.

FENNEMORE CRAIG, P.C.

PHOENIX

{00110975}

patents, copyrights, trademarks, domain names, customer lists, software, source code, websites, and all other assets related to or associated with e-commerce, causes of action, insurance, general intangibles, and all products and proceeds (including insurance proceeds) thereof (all such tangible, intangible, real and personal property, and the proceeds thereof, being collectively referred to hereinafter as the "**DIP Collateral**");

b. An allowed super-priority administrative claim with respect to the DIP Loan over any and all administrative expenses of the kinds specified in Code §§ 503(b) and 507(b) under Code § 364(c)(1).

8. The Court finds that notice of the Motion, as it relates to the entry of this Interim Order, is sufficient, and that no further notice is necessary.

9. The Debtor has shown good cause for the entry of this Interim Order and authorization for the Debtor to execute the DIP Loan Documents and any related documents and to obtain initial $60,000 of the DIP Loan pending a final hearing on the relief requested in the Motion and entry of a final order granting or denying the relief requested in the Motion. The Debtor's need for financing of the type afforded by this Interim Order and the DIP Loan Documents is immediate and critical. Entry of this Interim Order will minimize disruption of the Debtor's business and operations as a going concern and is in the best interests of the Debtor, its creditors, and the bankruptcy estate. The terms of the DIP Loan Documents authorized hereby are fair and reasonable, reflect the Debtor's reasonable exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration.

10. Based upon the Motion, the DIP Loan Documents, and the record presented at the interim hearing, the Court finds that the DIP Loan Documents and the DIP Loan to be evidenced thereby have been negotiated in good faith and at arm's length between the Debtor and the DIP Lender, and the DIP Loan shall be deemed to have been made in good faith within the meaning of Code § 364(e).

**THEREFORE, IT IS HEREBY ORDERED AS FOLLOWS:**

A.    The Court's findings of fact and conclusions of law made herein are incorporated in this Interim Order and constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052.

B.    Due, proper, timely, adequate, and sufficient notice of the Motion and the transactions contemplated thereby has been provided to all parties entitled thereto and such notice was good, sufficient, and appropriate under the circumstances, and no other or further notice of the Motion or the transactions contemplated thereby is or shall be required.

C.    Subject to the terms and conditions of this Interim Order, the Debtor shall be, and hereby is, authorized (a) to execute the DIP Loan Documents, which are approved hereby in all respects, in substantially similar form attached as <u>Exhibit 1</u> hereto, and all other related documents requested by the DIP Lender to give effect to the terms thereof and hereof, (b) to receive the $60,000 advance from the DIP Lender under this Interim Order, to be used only in accordance with the Budget attached as <u>Exhibit 2</u> hereto (the "**Budget**") and as provided in the DIP Loan Documents.

D.    Pending a final hearing on the relief requested in the Motion and entry of a Final Order granting or denying the relief requested in the Motion, the Debtor is further authorized to satisfy all conditions precedent and perform all obligations hereunder and thereunder in accordance with the terms hereof and thereof.

E.    Notwithstanding anything to the contrary in this Interim Order, in no event shall the DIP Lender be obligated to make any advances comprising the DIP Loan if at the time of a requested advance an Event of Default (as defined below) has occurred or a default under this Interim Order exists.  Proceeds of the DIP Loan may be used to pay items identified on the Budget as agreed between the Debtor and the DIP Lender.  The DIP Lender shall not have any obligation or responsibility to monitor the Debtor's use of proceeds of the DIP Loan and may, but is not required to, rely on the Debtor's representations that the amount of any advances requested

1   by the Debtor, and the use thereof, are in accordance with the requirements of this Interim Order,

2   the DIP Loan Documents, and the Budget.

3   F.      To secure the prompt payment and performance of the Obligations, the DIP

4   Lender shall have, and is hereby granted, effective on and after the Petition Date:

5               a.  Senior security interests and a perfected first-position lien in all of the Debtor's

6                   presently-owned and after-acquired assets and Collateral pursuant to Code §§

7                   364(d) and (c) ("**DIP Lien**");

8               b.  An allowed super-priority administrative claim with respect to the DIP Financing

9                   over any and all administrative expenses of the kinds specified in Code §§ 503(b)

10                  and 507(b) under Code § 364(c)(1).

11  G.      Notwithstanding anything to the contrary in the DIP Loan Documents, the DIP

12  Liens shall not attach to: (a) any causes of action pursuant to Code §§ 544, 545, 547, 548, 550, or

13  553 (the "**Avoidance Actions**") and (b) any monies recovered in connection with the successful

14  prosecution or settlement of Avoidance Actions.

15  H.      The occurrence or existence of any one or more of the following events or

16  conditions, whether voluntary or involuntary, constitute an Event of Default:

17              a.  Debtor fails to pay when due (whether due at stated maturity, upon acceleration, or

18                  as otherwise provided herein) any installment of principal, over advance, or

19                  interest on the DIP Loan, or otherwise owing under the DIP Loan Documents;

20              b.  Debtor fails to pay any of its other obligations on the due date thereof (whether

21                  due at stated maturity, upon acceleration, or as otherwise provided herein) and

22                  such failure shall continue for a period of ten days after DIP Lender's giving

23                  Debtor written notice thereof;

24              c.  Debtor fails to perform, keep, or observe any covenant contained in any DIP Loan

25                  Documents and the breach is not cured within ten days after Debtor's receipt of

26                  notice of such breach from DIP Lender;

d.  any representation or warranty made by or on behalf of Debtor, or other information provided by or on behalf of Debtor to DIP Lender, was incorrect or misleading in any material respect at the time it was made or provided;

e.  any DIP Loan Document is terminated other than as provided for in the DIP Loan Documents or becomes void or unenforceable, or any security interest or lien ceases to be a valid and perfected first-priority security interest in or lien on any portion of the DIP Collateral;

f.  a trustee or examiner with expanded powers is appointed in the Case and the order appointing such trustee, responsible officer, or examiner shall not have been stayed, reversed, or vacated within thirty days after the entry thereof;

g.  the dismissal of the Case, or the conversion of the Case from one under chapter 11 to one under chapter 7 of the Bankruptcy Code;

h.  the entry of an Order by the Bankruptcy Court granting relief from or modifying the automatic stay of Code § 362(a) with respect to any claim or property with a value exceeding $50,000;

i.  an order is entered by the Bankruptcy Court approving a sale of the Debtor or any DIP Collateral (other than the sale of Inventory in the ordinary course of business) on terms to which DIP Lender has not given its prior written consent, unless such motion provides for immediate repayment in cash of all obligations and indebtedness under the DIP Loan Documents; and/or

j.  without DIP Lender's written consent, the Debtor's actual cumulative disbursements exceeds the projected monthly disbursements in the Budget by more than 10% in any month.

I.  Except as provided otherwise in this Interim Order, upon the occurrence of an Event of Default, the automatic stay provisions of Code § 362 are vacated and modified without the need for further Court order to permit DIP Lender, and without any interference from the

1  Debtor or any other party-in-interest but subject to five (5) days' prior written notice (which may

2  be delivered by electronic mail) (the "Remedies Notice Period"), to the Debtor, its counsel,

3  counsel to any Committee, and counsel to the U.S. Trustee, to exercise all rights and remedies

4  provided for in the DIP Loan Documents, this Interim Order, or under other applicable

5  bankruptcy and non-bankruptcy law including, without limitation, the right to (i) terminate the

6  commitments under the DIP Loan; (ii) cease advancing funds under the DIP Loan and/or suspend

7  or terminate the commitments under the DIP Loan; (iii) declare all DIP Loan Indebtedness

8  immediately due and payable; (iv) take any actions reasonably calculated to preserve or safeguard

9  the DIP Collateral or to prepare the DIP Collateral for sale; (v) foreclose or otherwise enforce the

10  DIP Liens on any or all of the DIP Collateral; and (vi) exercise any other default-related rights

11  and remedies under the DIP Loan or this Interim Order.  The automatic stay of Bankruptcy Code

12  § 362(a), to the extent applicable, shall be deemed terminated without the necessity of any further

13  action by the Court in the event that the Debtor, any Committee, and/or the U.S. Trustee have not

14  obtained an order from this Court to the contrary prior to the expiration of the Remedies Notice

15  Period.  The Debtor, the Committee, if any, and/or the U.S. Trustee shall have the burden of proof

16  at any hearing on any request by them to re-impose or continue the automatic stay of Bankruptcy

17  Code § 362(a) or to obtain any other injunctive relief.  Immediately following the occurrence of

18  an Event of Default, after the expiration of the Remedies Notice Period, the DIP Lender may

19  charge interest at the default rate set forth herein.  No remedy herein conferred upon the DIP

20  Lender is intended to be exclusive of any other remedy and each and every such remedy shall be

21  cumulative and shall be in addition to every other remedy given hereunder or now or hereafter

22  existing at law or in equity or by statute or otherwise.  To the extent permitted by applicable law,

23  the Debtor and the DIP Lender severally waive presentment for payment, demand, protest and

24  notice of dishonor. No course of dealing between the Debtor and the DIP Lender or any delay on

25  the part of the DIP Lender in exercising any rights hereunder shall operate as a waiver of any

26  right.

FENNEMORE CRAIG, P.C.

PHOENIX

{00110975}

8

J.     Notwithstanding the applicability or potential applicability of Rule 6004(h), because immediate and irreparable harm would result if this Order is not immediately effective, the provisions of this Interim Order shall be effective immediately upon entry of this Interim Order by the Court.

K.     This Interim Order shall be sufficient and conclusive evidence of the priority, perfection, validity, and enforceability of all of the liens and security interests in and upon granted to the DIP Lender under the DIP Loan Documents, as set forth herein and in the DIP Loan Documents.  The DIP Lender shall not be required to file any financing statement, mortgage, deed of trust, assignments of rents, notice of lien, and/or any similar document or take any other action (including possession of any of the Collateral) to validate the perfection of the DIP Liens. If the DIP Lender shall, in its discretion, elect for any reason to file any such financing statements, mortgages, deeds of trust, assignments of rent, and/or other documents with respect to such security interests and liens, the Debtor is authorized and directed to execute, or cause to be executed, all such financing statements, mortgages, deeds of trust, assignments of rents, and/or other agreements, documents, or instruments upon the DIP Lender's request and the filing, recording, or service thereof (as the case may be) of such financing statements, or other agreements, documents, or instruments shall be deemed to have been made at the time of and on the Petition Date.  The DIP Lender may, in its discretion, file a certified copy of this Interim Order in any filing or recording office in any county or other jurisdiction in which the Debtor has an interest in real or personal property and, in such event, the subject filing or recording officer is authorized and directed to file or record such certified copy of this Interim Order.

L.     The automatic stay provisions of Code § 362 are hereby lifted and terminated as to the DIP Lender to the extent necessary to implement the provisions of this Interim Order and the DIP Loan Documents, thereby permitting the DIP Lender to receive collections of the DIP Collateral for application to the DIP Obligations as provided herein, to file or record any UCC-1

1  financing statements and other instruments and documents evidencing the DIP Liens, and to

2  enforce its security interests and liens upon default subject to the provisions of this Interim Order.

3       M.    The DIP Lender is extending credit on the terms set forth in the DIP Loan

4  Documents in good faith and after arms' length negotiation; therefore, under Code § 364(e), if

5  any or all of the provisions of this Interim Order are hereafter modified, vacated, or stayed —

6       a.   such stay, modification, or vacation shall not affect the validity of any obligation,

7  indebtedness, liability, security interest, or lien granted or incurred by the Debtor

8  to the DIP Lender prior to the effective date of such stay, modification, or

9  vacation, or the validity, enforceability, or priority of any security interest, lien,

10 priority, or right authorized or created under the original provisions of this Interim

11 Order or pursuant to the DIP Loan Documents; and

12      b.   any indebtedness, obligation, or liability incurred by the Debtor to the DIP Lender

13 under the DIP Loan Documents prior to the effective date of such stay,

14 modification, or vacation shall be governed in all respects by the original

15 provisions of this Interim Order, and the DIP Lender shall be entitled to all the

16 rights, remedies, privileges, and benefits, including the DIP Liens and the super-

17 priority claims granted herein and pursuant to the DIP Loan Documents, with

18 respect to any such indebtedness, obligation, or liability.  The DIP Loan is made in

19 reliance upon this Interim Order, and, therefore, the indebtedness resulting from

20 such DIP Loans prior to the effective date of any stay, modification, or vacation of

21 this Interim Order cannot (i) be subordinated, (ii) lose the priority of the DIP Lien

22 or the super-priority claims, or (iii) be deprived of the benefit of the status of the

23 Security Interest, the super-priority claims, or any other liens or claims granted to

24 the DIP Lender under this Interim Order or the DIP Loan Documents, as a result of

25 any subsequent order in this Case or any subsequent case of the Debtor.

26

1    N.    Promptly after entry of this Order, the Debtor shall provide notice, together with a

2  copy of this Interim Order and a copy of the Motion, to all parties having been given notice of the

3  interim hearing, counsel to any official committee of unsecured creditors appointed in this case,

4  the Office of the United States Trustee, and all parties who have filed requests for notice under

5  Bankruptcy Rule 2002.  Any party-in-interest objecting to the entry of a Final Order approving

6  the relief sought in the Motion shall file written objections with the Court no later than 4:00 p.m.

7  (MST) on or before June __, 2018, which objections shall be served so that the same are received

8  on or before such date and time by counsel for the Debtor, counsel for the DIP Lender, and the

9  Office of the United States Trustee.

10    O.    The Final Hearing will be held on _____ __, 2018, at __:___ __.m. in

11  Courtroom ___, U.S. Courthouse and Federal Building, 230 North 1st Avenue, Suite 101,

12  Phoenix, AZ 85003.

13

14                        **DATED AND SIGNED ABOVE**

15

16

17

18

19

20

21

22

23

24

25

26

Fennemore Craig, P.C.

Phoenix

{00110975}

# EXHIBIT 1

**SECURED PROMISSORY NOTE**
**(Interest-Only Payments)**

$100,000.00                                                    Date: June __, 2018

       FOR VALUE RECEIVED, Tanga.com, LLC, a Delaware limited liability company ("Maker") promises to pay to ZR Ventures, LLC ("Holder") a Delaware limited liability company located at 1201 Orange St., Ste 600, Wilmington, DE 19801, or at such other address as Holder may specify, the principal sum of One Hundred Thousand and No/100 Dollars ($100,000.00) (the "Loan"), together with interest on the unpaid principal balance at the rate of twelve percent (12%) per annum pursuant to the terms of this Secured Promissory Note (the "Note"), plus Holder's attorney's fees and costs incurred in documenting this loan transaction. The Note shall be fully amortized over seven (7) months ("Term"), and any balance remaining due under this Note shall be payable in full upon maturity. Interest only monthly payments shall be in the amount of One Thousand and No/100 Dollars ($1,000.00) ("Interest Payments"), the first of which shall be due on June ___, 2018 ("Initial Payment Date"). All future Interest Payments shall be made monthly on the fifteenth (15th) calendar day of each month. All payments shall be made in United States legal currency. Maker shall have the right at any time or from time to time to pay all or a portion of the principal and accrued interest without premium or penalty. Prepayments shall apply first to accrued interest and then to principal. Despite any prepayments, Maker shall continue to pay the Interest Payments in accordance with the terms of this Note.

       Holder and Maker, jointly and severally, understand and acknowledge the purpose of this Note and the Security Agreement referred to herein and executed this same day is for Maker, a debtor-in-possession in Case No. 2:18-bk-06314-BMW (the "Case"), to obtain post-petition financing (i.e., a DIP Loan), which is subject to approval from the U.S. Bankruptcy Court for the District of Arizona, and is to be used for the strict purpose of funding Maker's post-petition operations in accordance with the attached budget. Accordingly, the Loan shall be funded in two installments. Holder shall fund 60% of the principal balance (or $60,000.00) within two business days of entry of an interim order authorizing Maker to obtain the Loan as provided herein. Holder shall fund the second installment of the remaining 40% of the principal balance (or $40,000.00) upon entry of a final order authorizing Maker to obtain the Loan. Absent the U.S. Bankruptcy Court approving Maker to obtain this Loan, Holder is under no obligation to fund the Loan, and this Note, along with the Security Agreement, shall be null and void.

The occurrence or existence of any one or more of the following events or conditions, whether voluntary or involuntary, constitute an event of default ("Event(s) of Default"): (a) Maker fails to pay when due (whether due at stated maturity, upon acceleration, or as otherwise provided herein) any installment of principal, over advance, or interest on the Loan, or any other amounts otherwise owing under the Note; (b) Maker fails to pay any of its other obligations on the due date thereof (whether due at stated maturity, upon acceleration, or as otherwise provided herein) and such failure shall continue for a period of ten days after Holder's giving Maker written notice thereof; (c) Maker fails to perform, keep, or observe any covenant contained herein or the Security Agreement and the breach is not cured within five days after Maker's receipt of notice of such breach from Holder; (d) any representation or warranty made by or on behalf of Maker, or other information provided by or on behalf of Maker to Holder, was incorrect or misleading in any material respect at the time it was made or provided; (e) this Note or the Security Agreement

is terminated for any reason other than as provided for herein or the Security Agreement or becomes void or unenforceable, or any security interest or lien granted hereby ceases to be a valid and perfected first-priority security interest in or blanket lien on any portion of the Collateral; (f) a trustee or examiner with expanded powers is appointed in the Case and the order appointing such trustee, responsible officer, or examiner shall not have been stayed, reversed, or vacated within thirty days after the entry thereof; (g) the dismissal of the Case, or the conversion of the Case from one under chapter 11 to one under chapter 7 of the Bankruptcy Code; (h) the entry of an Order by the Bankruptcy Court granting relief from or modifying the automatic stay of Code § 362(a) with respect to any claim or property with a value exceeding $50,000; (i) an order is entered by the Bankruptcy Court approving a sale of the Maker or any of the Collateral (other than the sale of inventory in the ordinary course of business) on terms to which Lender has not given its prior written consent, unless such motion provides for immediate repayment in cash of all obligations and indebtedness under the DIP Loan Documents; and/or (j) without Holder's written consent, the Maker's actual cumulative disbursements exceeds the projected monthly disbursements in the Budget by more than 10% in any month.

In the event Maker is unable to pay an Interest Payment in full (the "Payment Deficiency"), at Holder's option and sole discretion, the amount of the Payment Deficiency will be added to the then-outstanding principal balance of the Loan, and the Loan shall be re-amortized over the then-remaining amount of the Term.

Should Maker default on any amount when due, and such default remains uncured and continuing following the expiration of five (5) calendar days after written notice of said default is provided, then the whole sum of principal plus interest shall become immediately due and payable at Holder's option, with interest from and after the date of such default at eighteen percent (18%) per annum. Maker shall be responsible for all costs of collection, including attorneys' fees, court costs, and post-judgment collection costs. If Holder or Maker commences any arbitration, lawsuit, or other legal proceeding with respect to the enforcement of the terms and conditions hereof, the successful party in such proceeding shall be awarded, in addition to any other remedy, its attorneys' fees and court costs prosecuting or defending that proceeding as well as all post judgment collection costs.

In the event garnishment, attachment, levy, or execution is issued against any of the property or assets of Maker, or upon the happening of any event that constitutes a default pursuant to the terms of any agreement or other instrument given in connection with this Note, or if the Maker shall make an assignment for the benefit of creditors, admit in writing the inability to pay debts as they become due, or if a court of competent jurisdiction shall enter an order, judgment, or decree appointing a receiver for the assets or affairs of Maker, or Maker fails to pay the principal and any accrued interest in full on or before the due date, or a misrepresentation by the Maker to Holder for the purpose of extending credit, or if Maker sells, transfers, assigns or in any way disposes or attempts to dispose of any assets or collateral pledged as security for the payment of this Note without making payment in full on this Note, this Note shall become immediately due and payable without notice to Maker.

Maker covenants and agrees that until full repayment of the indebtedness evidenced by this Note: (a) Maker will not create, incur, assume, or suffer to exist any lien of any kind upon any of its property, assets or collateral, whether now owned or hereafter acquired, except upon express written permission of Holder; (b) Maker will notify Holder if Maker defaults in any

material respect in the performance or fulfillment of any of the obligations, covenants, or conditions contained in any agreement or instrument to which Maker is a party, or by which Maker or any of its properties are bound within five (5) days of such default; and (c) Maker will notify Holder if there shall be a material adverse change in Maker's business or financial conditions, operations, or properties within five (5) days of such change. Notice under this Note shall be provided in accordance with the contemporaneously executed Security Agreement between Maker and Holder.

Failure of Holder to exercise any option hereunder shall not constitute a waiver of the right to exercise the same in the event of any subsequent default or in the event of continuance of any existing default after demand for strict performance.

Maker agrees to be bound for all purposes with full recourse, and severally waive demand, diligence, presentment for payment, protest and notice of demand, protest, nonpayment, and exercise of any option hereunder. Maker further agrees that the granting without notice of any extension or extensions of time for payment of any sum or sums due hereunder, or under any security agreement or other instrument securing this Note, or for the performance of any covenant, condition, or agreement hereof or thereof or the taking or release of other or additional security shall in no way release or discharge the liability of Maker. Holders' rights and remedies under this Note are cumulative and all shall be available to Holder at all times until this Note has been paid and performed in full. No delay or omission of Holder to exercise any right or power under this Note shall impair such right or power or be construed to be a waiver of any default or acquiescence therein, and any single or partial exercise of any such right or power shall not preclude any other or further exercise thereof or the exercise of any other right or power and no such waiver whatsoever shall be valid unless in writing signed by the Holder and then only to the extent set forth in such writing.

Maker agrees to execute and deliver such further documents, including the Security Agreement executed the same date herewith, and to do such other acts and things as Holder may reasonably request from time to time to further effect the purposes of this Note and the due performance by Maker of its obligations hereunder.

The obligations and rights under this Note shall be binding upon and inure to the benefit of Maker and Holder and their respective permitted successors, endorsees, and assigns, except that Maker shall not assign or transfer its obligations hereunder without the prior written consent of Holder, which consent may be withheld or granted at Holder's sole and absolute discretion.

The invalidity or unenforceability of any of the provisions hereof shall not affect the validity or enforceability of the remainder of the Note.

This Note may not be modified in any way and shall be governed by, and construed and interpreted in accordance with, the laws of the State of Arizona and the U.S. Bankruptcy Code (11 U.S.C. §§ 101 *et. seq.*). Any action, suit, or proceeding shall be brought in the U.S. Bankruptcy Court for the District of Arizona, and Maker hereby expressly consents to the jurisdiction of such court.

**MAKER:**              TANGA.COM, LLC,

{00109696}        3

a Delaware limited liability company

By _____
    Jeremy Young, Manager

# SECURITY AGREEMENT

This AGREEMENT ("**Agreement**") is entered into as of June ___, 2018 among Tanga.com, LLC ("**Borrower**") and ZR Ventures, LLC ("**Lender**"). Borrower and Lender are referred to herein from time to time collectively as the "**Parties**" and individually as a "**Party**."

## RECITALS

On June 1, 2018, Borrower filed a voluntary petition for relief under the Bankruptcy Code, commencing Bankruptcy Case No. 2:18-bk-06314-BMW (the "**Case**"). The Debtor operates as a debtor in possession and needs financing to continue operations during the pendency of the Case.

Lender and Borrower entered into a Secured Promissory Note of even date herewith (the "**Note**"), pursuant to which Lender has agreed to loan Borrower the amount of One Hundred Thousand and No/100 ($100,000.00) (the "**DIP Loan**").

The purpose of this Agreement and the Note are for Borrower to obtain post-petition, debtor-in-possession financing, subject to approval from the U.S. Bankruptcy Court for the District of Arizona ("**Bankruptcy Court**").

Pursuant to the Note, the DIP Loan shall be funded in two installments. Lender shall fund 60% of the principal balance (or $60,000.00) within two business days of entry of an interim order authorizing Maker to obtain the Loan as provided herein. Lender shall fund the second installment of the remaining 40% of the principal balance (or $40,000.00) promptly after entry of a final order authorizing Maker to obtain the Loan.

NOW THEREFORE, in consideration of the premises and to induce Lender to enter into and perform under the Note, Borrower hereby agrees with Lender as follows:

## AGREEMENT

**SECTION 1. *Borrower's Grant of Security***. Borrower hereby assigns and pledges to Lender, and hereby grants to Lender, a first-position senior security interest and blanket lien ("**DIP Lien(s)**") on all of Borrower's property and assets (tangible, intangible, real, personal, and mixed), whether in existence on or before the Petition Date or created, acquired, or arising on or after the Petition Date and wherever located, including, without limitation, accounts, cash, deposit accounts, inventory, equipment, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks, domain names, customer lists, software, source code, websites, and all other assets related to or associated with e-commerce, causes of action, insurance, general intangibles, and all products and proceeds (including insurance proceeds) thereof (all such tangible, intangible, real and personal property, and the proceeds thereof, being collectively referred to hereinafter as the "**Collateral**"). It is the intent and understanding of the parties hereto that the coverage of the security interest granted hereby be broadly and liberally construed to include all personal property of any nature.

**SECTION 2.** *Security for Obligations.* This Agreement secures the payments of all obligations of Borrower now or hereafter existing under the Note, whether for principal, interest, fees, legal fees and costs, expenses or otherwise, and all obligations of Borrower now or hereafter existing under this Agreement (the "**Obligations**").

**SECTION 3.** *Borrower Remains Liable.* Notwithstanding anything herein to the contrary:

(a) Borrower shall remain liable under the contracts and agreements included in the Collateral to the extent set forth therein to perform all of its duties and obligations thereunder to the same extent as if this Agreement had not been executed;

(b) Lender's exercise of any of the rights hereunder shall not release Borrower from any of its duties or obligations under the contracts and agreements included in the Collateral; and

(c) Lender shall have no obligation or liability under the contracts and agreements included in the Collateral by reason of this Agreement, nor shall Lender be obligated to perform any of the obligations or duties of Borrower thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

**SECTION 4.** *Representations and Warranties of Borrower.* Borrower represents and warrants as follows:

(a) Most of the tangible personal property covered hereby is located at 2487 South Gilbert Road, Suite 106-485, Chandler, AZ 85225 and 2414 South Gilbert Road, Chandler, AZ 85286, and other assets are located in the residences of those employees who work remotely;

(b) This Agreement creates a valid first-priority security interest in and lien on the Collateral, securing the payment of the Obligations;

(c) This Agreement creates a super priority administrative expense claim under 11 U.S.C. §§ 364(c)(1) and (c)(2), which shall be deemed allowed without any further filing by Lender, and which shall have priority over any and all administrative expenses of the kind specified in 11 U.S.C. §§ 503(b) and 507(b).

(d) Borrower owns the Collateral free and clear of any lien, security interest, charge or encumbrance. No effective financing statement or other similar instrument is on file in any recording office covering the Collateral, except such as may have been or will be filed in favor of Lender relating to this Agreement; and

(e) No authorization, approval or other action by, and no notice to or filing with, any governmental authority or regulatory body not already undertaken is required either: (i) for the grant by Borrower of the security interest granted hereby or for the execution, delivery or performance of this Agreement by Borrower; or (ii) for the perfection of or the exercise by Lender of its rights and remedies hereunder.

**SECTION 5.  *Further Assurances.***

(a)     Borrower agrees that, from time to time, Borrower will promptly execute and deliver all further instruments and documents and take all further action that may be necessary or that Lender may reasonably request to perfect and protect any security interest granted or purported to be granted hereby or to enable Lender to exercise and enforce its rights and remedies hereunder with respect to any Collateral.  Without limiting the generality of the foregoing, Borrower will: (i) at the request of Lender, mark conspicuously each security, contract, chattel paper included in Collateral, and each of its records pertaining to Collateral with a legend, in form and substance satisfactory to Lender indicating that any of the foregoing is subject to the security interest granted hereby; and (ii) execute and file such financing or continuation statements, or amendments thereto and such other instruments or notices, or take such further action, as may be necessary or as Lender may reasonably request, in order to perfect and preserve the security interests granted or purported to be granted hereby;

(b)     Borrower hereby authorizes Lender to file one or more financing statements, and amendments thereto, relative to all or part of the Collateral without the signature of Borrower where permitted by law; and

(c)     Borrower will furnish to Lender from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as Lender may reasonably request, all in reasonable detail.

**SECTION 6.  *As to Equipment and Inventory*.**  Borrower shall:

(a)     Other than in the ordinary course of business, keep the Collateral at the places specified in Section 4(a) or, upon 30 days' prior written notice to Lender, at such other places in jurisdictions where all action required by Section 5 shall have been taken with respect to the Collateral; and

(b)     Pay promptly when due all property and other taxes, assessments and governmental charges or levies imposed upon, and all claims (including claims for labor, materials and supplies) against the Collateral, except to the extent Borrower is contesting the validity thereof in good faith, in which case Borrower shall notify Lender of such dispute and the nature of such dispute.

**SECTION 7.  *Insurance*.**  Borrower shall, at its own expense, maintain a complete insurance package including against fire and such other hazards included within the term "all risks" in such amounts, against such risks, in such form and with such insurers, as shall reasonably be required from time to time by Lender for the benefit of Borrower and Lender as their respective interests shall appear.  Borrower assigns to Lender all rights to proceeds of any insurance not exceeding the Obligations and directs any insurer to pay all proceeds directly to Lender and authorizes Lender to endorse any draft for such proceeds.  Each policy for liability insurance shall provide for all losses to be paid on behalf of Lender and Borrower as their respective interests may appear and shall provide that at least ten (10) days' prior written notice of cancellation, amendment, change of beneficiary or lapse shall be given to Lender by the insurer.  Borrower shall, if so requested by Lender, deliver to Lender original or duplicate

policies of such insurance.

### SECTION 8. *As to Receivables*.

(a)     Borrower shall keep its records concerning the Receivables at the locations specified in Section 4(a) or, upon 30 days' prior written notice to Lender, at such other locations in a jurisdiction where all action required by Section 5 shall have been taken with respect to the Receivables.  Borrower will maintain and preserve such records on chattel paper and will permit representatives of Lender at any time during normal business hours to inspect and make abstracts from such records and chattel paper;

(b)     Except as otherwise provided in this subsection (b), Borrower shall continue to collect, at its own expense, all amounts due or to become due to Borrower under the Receivables. In connection with such collections, Borrower may take (and, at Lender's direction, if an event of default shall occur, shall take) such action as Borrower or Lender may deem necessary or advisable to enforce collection of the Receivables; *provided, however,* that upon the occurrence of an event of default under this Agreement or the Note, Lender shall have the right to notify the account debtors or obligors under any Receivables of the assignment of such Receivables to Lender and to direct such account debtors or obligors to make payment of all amounts due or to become due to Borrower thereunder directly to Lender and, upon such notification and at the expense of Borrower, to enforce collection of any such Receivables and to adjust, settle, or compromise the amount or payment thereof, in the same manner and to the same extent as Borrower might have done.  After receipt by Borrower of the notice from Lender referred to in the *proviso* to the preceding sentence;

(i)     all amounts and proceeds (including instruments) received by Borrower in respect of the Receivables shall be received in trust for the benefit of Lender hereunder, shall be segregated from other funds of Borrower and shall be forthwith paid over to Lender; and

(ii)     Borrower shall not adjust, settle, or compromise the amount or payment of any of the Receivables, or release wholly or partly an account debtor or obligor thereof, or allow any credit or discount thereon, without written approval from Lender.

### SECTION 9. *Transfers and Other Liens*.  Borrower shall not:

(a)     Sell, assign (by operation of law or otherwise) or otherwise dispose of any of Collateral, except in the ordinary course of business pursuant to Fed. R. Bankr. P. 6004 without approval from the Bankruptcy Court or without written consent of the Lender; and in the event the Bankruptcy Court approves a sale not in Borrower's ordinary course of business, Lender may credit bid for the then-balance of the DIP Loan. Should the resulting sale price exceed the balance of the DIP Loan, the Collateral shall be sold free and clear of the security interest created hereby, with said security interest attaching to the sale proceeds upon closing of the sale transaction;

(b)     Create or suffer to exist any lien, security interest, or other charge or encumbrance upon or with respect to any of Collateral to secure debt of any person or entity, except for the security interest created by this Agreement; and

(c)     Under no circumstances shall Borrower sell, assign, or otherwise dispose of any Collateral that consists of investment securities, stock, or membership interests owned by Borrower.

**SECTION 10.**  *Lender Appointed Attorney-in-Fact*.     Borrower hereby irrevocably appoints Lender as Borrower's attorney-in-fact, with full authority in the place and stead of Borrower and in the name of Borrower or otherwise, from time to time in Lender's discretion, upon the occurrence of an Event of Default, to accomplish the purposes of this Agreement, including without limitation:

(a)     To obtain and adjust insurance required to be paid to Lender pursuant to Section 7;

(b)     To ask, demand, collect, sue for, recover, compound, receive, and give acquittance and receipts for monies due and to become due under or in respect of any of the Collateral;

(c)     To receive, enforce, and collect any drafts or other instruments, documents, and chattel paper, in connection with clause (a) or (b) above; and

(d)     To file any claims or take any action or institute any proceedings which Lender may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of Lender with respect to any of the Collateral.

**SECTION 11.**  *Lender May Perform*.   If Borrower fails to perform any agreement contained herein, upon the occurrence of an event of default under the Note, Lender may cure such event of default, and the expenses of Lender incurred in connection therewith shall be payable by Borrower under Section 14(b).

**SECTION 12.**  *Lender's Duties*.   The powers conferred on Lender hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon it to exercise any such powers.  Except for the safe custody of any Collateral in its possession and the accounting for monies actually received by it hereunder, Lender shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral.

**SECTION 13.**  *Events of Default*.   The occurrence or existence of any one or more of the following events or conditions, whether voluntary or involuntary, constitute an event of default ("Event(s) of Default"):

a.   Borrower fails to pay when due (whether due at stated maturity, upon acceleration, or as otherwise provided herein) any installment of principal, over advance, or interest on, or any other amounts otherwise owing under the Note;

b.   Borrower fails to pay any of its other obligations on the due date thereof (whether due at stated maturity, upon acceleration, or as otherwise provided herein) and

such failure shall continue for a period of ten days after Lender's giving Borrower written notice thereof;

c. Borrower fails to perform, keep, or observe any covenant contained in any DIP Loan Documents and the breach is not cured within ten days after Borrower's receipt of notice of such breach from Lender;

d. any representation or warranty made by or on behalf of Borrower, or other information provided by or on behalf of Borrower to Lender, was incorrect or misleading in any material respect at the time it was made or provided;

e. the Note or this Agreement is terminated for any reason other than as provided for in the Note or this Agreement or becomes void or unenforceable, or any security interest or lien granted hereby ceases to be a valid and perfected first-priority security interest in or blanket lien on any portion of the Collateral;

f. a trustee or examiner with expanded powers is appointed in the Case and the order appointing such trustee, responsible officer, or examiner shall not have been stayed, reversed, or vacated within thirty days after the entry thereof;

g. the dismissal of the Case, or the conversion of the Case from one under chapter 11 to one under chapter 7 of the Bankruptcy Code;

h. the entry of an Order by the Bankruptcy Court granting relief from or modifying the automatic stay of Code § 362(a) with respect to any claim or property with a value exceeding $50,000;

i. an order is entered by the Bankruptcy Court approving a sale of the Borrower or any of the Collateral (other than the sale of inventory in the ordinary course of business) on terms to which Lender has not given its prior written consent, unless such motion provides for immediate repayment in cash of all obligations and indebtedness under the DIP Loan Documents; and/or

j. without Lender's written consent, the Borrower's actual cumulative disbursements exceeds the projected monthly disbursements in the Budget by more than 10% in any month.

**SECTION 14.** _**Remedies**_. Upon the occurrence of an Event of Default, subject to five (5) days' prior written notice (which may be delivered by electronic mail) (the "Remedies Notice Period") to the Borrower and its counsel, the Lender may, without any interference from the Borrower, exercise all rights and remedies provided for in the Note and this Agreement, or under other applicable law including, without limitation, the right to:

a. terminate the commitments under the DIP Loan;

b. cease advancing funds under the DIP Loan and/or suspend or terminate the commitments under the DIP Loan;

c. declare all Obligations immediately due and payable;

d. take any actions reasonably calculated to preserve or safeguard the Collateral or to prepare the Collateral for sale;

e. foreclose or otherwise enforce the DIP Lien on any or all of the Collateral; and

f. exercise any other default-related rights and remedies under the DIP Loan or this Interim Order.

g. Immediately following the occurrence of an Event of Default, after the expiration of the Remedies Notice Period, the Lender may charge interest at the default rate set forth herein. No remedy herein conferred upon the Lender is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or otherwise. To the extent permitted by applicable law, the Debtor and the Lender severally waive presentment for payment, demand, protest and notice of dishonor. No course of dealing between the Debtor and the Lender or any delay on the part of the Lender in exercising any rights hereunder shall operate as a waiver of any right.

**SECTION 15.** *Expenses*. Upon the occurrence of an event of default under the Note, Borrower will, upon demand, pay to Lender the amount of any and all reasonable expenses, including the reasonable fees and disbursements of its counsel and of any experts and agents, which Lender may incur in connection with:

(a) the custody, preservation, use or operation of, or the sale of, collection from, or other realization upon, any of the Collateral;

(b) the exercise or enforcement of any of the rights of Lender hereunder, unless they be with respect to litigation or arbitration in which case the prevailing party in any such action shall be entitled to be paid its reasonable attorneys' fees, expenses, and costs of litigation; or

(c) the failure by Borrower to perform or observe any of the provisions hereof.

**SECTION 16.** *Security Interest Absolute*. All rights of Lender and security interests hereunder, and all Obligations hereunder, shall be absolute and unconditional, irrespective of:

(a) Any lack of validity or enforceability of the Note, or any other agreement or instrument relating thereto;

(b) Any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations or any other amendment or waiver of or any consent to any departure from the Note;

(c) Any exchange, release or non-perfection of any other collateral, for all or any of the Obligations; or

(d) Any other circumstances which might otherwise constitute a defense available to, or a discharge of, Borrower with respect to the Obligations of Borrower in respect of this

Agreement.

**SECTION 17.** *Amendments/Waiver*.  No amendment or waiver of any provision of this Agreement nor consent to any departure by Borrower herefrom, shall in any event be effective unless the same shall be in writing and signed by Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

**SECTION 18.** *Notices*.  All notices, requests, demands, and other communications (each, a "Notice") required to be provided to the other Party pursuant to this Agreement shall be in writing and shall be delivered: (a) in person, (b) by certified U.S. Mail, with postage prepaid and return receipt requested, (c) by overnight courier service, or (d) by facsimile transmittal, with a verification copy sent on the same day by any of the methods set forth in clauses (a), (b), and (c), to the other Party to this Agreement at the following address or facsimile number:

| | |
|---|---|
| If to Lender: | ZR Ventures, LLC<br>1201 Orange Ste., Ste 600<br>Wilmington, DE 19801 |
| With a copy to: | Hilary L. Barnes, Esq.<br>ALLEN BARNES & JONES, PLC<br>1850 N Central Ave., Suite 1150<br>Phoenix, AZ 85004 |
| If to Borrower: | Tanga.com, LLC<br>Attn: Jeremy Young<br>2487 South Gilbert Road<br>Suite 106-485<br>Chandler, AZ 85225 |
| With a copy to: | Anthony W. Austin, Esq.<br>FENNEMORE CRAIG, P.C.<br>2394 East Camelback Road<br>Suite 600<br>Phoenix, AZ 85016 |

**SECTION 19.** *Continuing Security Interest; Transfer of Note*.  This Agreement shall create a continuing security interest in the Collateral and shall:

(a)      Remain in full force and effect until payment in full of the Obligations;

(b)      Be binding upon Borrower, its successors and assigns; and

(c)      Inure to the benefit of Lender and its successors, transferees, and assigns.

Without limiting the generality of the foregoing clause (c), Lender may assign or otherwise transfer the Note (or any interest thereunder) to any other person or entity, and such other persons or entity shall thereupon become vested with all the benefits in respect thereof

granted to Lender herein or otherwise. Upon the payment in full of the Obligations, the security interest granted hereby shall terminate and all rights to the Collateral shall revert to Borrower. Upon any such termination, Lender will execute and file all necessary termination statements to release all liens in the Collateral.

**SECTION 20.** *Governing Law; Terms*. This Agreement shall be governed by and construed in accordance with the laws of the State of Arizona and the U.S. Bankruptcy Code (11 U.S.C. §§ 101 *et. seq.*). Unless otherwise defined herein or in the Note, terms used in Article 9 of the Code in the State of Arizona are used herein as therein defined. All terms defined in the Note and not otherwise defined herein shall have the same meaning herein as used in the Note.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed and delivered by its officer duly authorized as of the date first above written.

**BORROWER:**                                **LENDER:**

Tanga.com, LLC,                             ZR Ventures, LLC,
a Delaware limited liability company        a Delaware limited liability company


_____            _____
Jeremy Young, Manager                      Hilary L. Barnes, Esq., as attorney for ZR
                                           Ventures, LLC

# EXHIBIT
# 2

**13 Week Cash Flow Budget**
**Tanga.com, LLC**

| | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | TOTAL | Daily Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Updated on: 6/14/2018 | 6/1/2018 | 6/8/2018 | 6/15/2018 | 6/22/2018 | 6/29/2018 | 7/6/2018 | 7/13/2018 | 7/20/2018 | 7/27/2018 | 8/3/2018 | 8/10/2018 | 8/17/2018 | 8/24/2018 | | |
| Week 1 Ending Date: 6/7/2018 | 6/7/2018 | 6/14/2018 | 6/21/2018 | 6/28/2018 | 7/5/2018 | 7/12/2018 | 7/19/2018 | 7/26/2018 | 8/2/2018 | 8/9/2018 | 8/16/2018 | 8/23/2018 | 8/30/2018 | | |
| **Beginning Cash Balance** | $ 121,510.93 | $ 111,144.95 | $ 212,577.97 | $ 173,751.70 | $ 179,290.55 | $ 118,836.71 | $ 126,640.51 | $ 104,129.33 | $ 107,533.09 | $ 137,396.83 | $ 84,398.90 | $ 88,850.96 | $ 61,233.35 | $ 121,510.93 | |
| | | | | | | | | | | | | | | | |
| **Income** | | | | | | | | | | | | | | | |
| Deposits (Will need to reconcile to Revenue Type) | | | | | | | | | | | | | | - | |
| Chargebacks | | | | | | | | | | | | | | - | |
| Product Revenue (Organic - Tanga Deals) | 105,000.00 | 105,000.00 | 105,000.00 | 110,250.00 | 110,250.00 | 110,250.00 | 110,250.00 | 121,275.00 | 121,275.00 | 121,275.00 | 121,275.00 | 121,275.00 | 121,275.00 | 1,483,650.00 | 16,303.85 |
| Product Revenue (Affiliate - Old Model) | 36,750.00 | 36,750.00 | 36,750.00 | 38,587.50 | 38,587.50 | 38,587.50 | 38,587.50 | 42,446.25 | 42,446.25 | 42,446.25 | 42,446.25 | 42,446.25 | 42,446.25 | 519,277.50 | 5,706.35 |
| Ad Revenue | 7,000.00 | | | | 5,000.00 | | | | 5,000.00 | | | | | 17,000.00 | 186.81 |
| Asset Sale & Other Revenue | 30,000.00 | | | | | | | | | | | | | 30,000.00 | 329.67 |
| **Total Income** | 178,750.00 | 141,750.00 | 141,750.00 | 148,837.50 | 153,837.50 | 148,837.50 | 148,837.50 | 163,721.25 | 168,721.25 | 163,721.25 | 163,721.25 | 163,721.25 | 163,721.25 | 2,049,927.50 | 22,526.68 |
| | | | | | | | | | | | | | | | |
| **Cost of Goods Sold** | | | | | | | | | | | | | | | |
| Vendor Payments Made (Will need to reconcile to Product Type) | | | | | | | | | | | | | | - | |
| Product Cost Organic (75%) | (78,750.00) | (78,750.00) | (78,750.00) | (82,687.50) | (82,687.50) | (82,687.50) | (82,687.50) | (90,956.25) | (90,956.25) | (90,956.25) | (90,956.25) | (90,956.25) | (90,956.25) | (1,112,737.50) | (12,227.88) |
| Product Cost (5%) | (3,937.50) | (3,937.50) | (3,937.50) | (4,134.38) | (4,134.38) | (4,134.38) | (4,134.38) | (4,547.81) | (4,547.81) | (4,547.81) | (4,547.81) | (4,547.81) | (4,547.81) | (55,636.88) | (611.39) |
| Product Cost - Old Affiliate (75%) | (27,562.50) | (27,562.50) | (27,562.50) | (28,940.63) | (28,940.63) | (28,940.63) | (28,940.63) | (31,834.69) | (31,834.69) | (31,834.69) | (31,834.69) | (31,834.69) | (31,834.69) | (389,458.13) | (4,279.76) |
| Product Cost - Old Affiliate (5%) | (1,378.13) | (1,378.13) | (1,378.13) | (1,447.03) | (1,447.03) | (1,447.03) | (1,447.03) | (1,591.73) | (1,591.73) | (1,591.73) | (1,591.73) | (1,591.73) | (1,591.73) | (19,472.91) | (213.99) |
| Affiliate Commissions - Old Affiliate (6%) | (21,000.00) | (1,000.00) | (1,000.00) | (1,000.00) | (12,245.50) | (1,000.00) | (1,000.00) | (1,000.00) | (1,000.00) | (13,270.83) | (1,000.00) | (1,000.00) | (1,000.00) | (56,516.33) | (621.06) |
| Merchant Fees (3%) | (11,788.50) | (20,000.00) | | | | (17,647.88) | | | | | (24,111.68) | | | (61,759.55) | (678.68) |
| Returns (Shipping, etc) | (11,788.50) | (11,788.50) | (11,788.50) | (12,227.93) | (12,227.93) | (12,227.93) | (12,227.93) | (13,150.72) | (13,150.72) | (13,150.72) | (13,150.72) | (13,150.72) | (13,150.72) | (163,181.51) | (1,793.20) |
| Returns Credits (Recapture Rate 80%) | 9,430.80 | 9,430.80 | 9,430.80 | 9,782.34 | 9,782.34 | 9,782.34 | 9,782.34 | 10,520.57 | 10,520.57 | 10,520.57 | 10,520.57 | 10,520.57 | 10,520.57 | 130,545.20 | 1,434.56 |
| Marketplace Fee Expense (ESG $1500 & Channel Advisor $4K) | (5,500.00) | | | (5,500.00) | | | | (5,500.00) | | | | | (5,500.00) | (22,000.00) | (241.76) |
| **Total Cost of Goods Sold** | (140,485.83) | (134,985.83) | (114,985.83) | (126,155.12) | (131,900.62) | (138,302.99) | (120,655.12) | (138,060.63) | (132,560.63) | (144,831.45) | (156,672.30) | (132,560.63) | (138,060.63) | (1,750,217.58) | (19,233.16) |
| | | | | | | | | | | | | | | | |
| **Gross Profit** | | | | | | | | | | | | | | | |
| Product Cost (Organic) | 26,250.00 | 26,250.00 | 26,250.00 | 27,562.50 | 27,562.50 | 27,562.50 | 27,562.50 | 30,318.75 | 30,318.75 | 30,318.75 | 30,318.75 | 30,318.75 | 30,318.75 | 370,912.50 | 25.0% | 4,075.96 |
| Product (Affiliate) | (11,812.50) | 8,187.50 | 8,187.50 | 8,646.88 | (2,598.63) | 8,646.88 | 8,646.88 | 9,611.56 | 9,611.56 | (2,659.26) | 9,611.56 | 9,611.56 | 9,611.56 | 73,303.05 | 14.1% | 805.53 |
| 5% Premium | (5,315.63) | (5,315.63) | (5,315.63) | (5,581.41) | (5,581.41) | (5,581.41) | (5,581.41) | (6,139.55) | (6,139.55) | (6,139.55) | (6,139.55) | (6,139.55) | (6,139.55) | (75,109.78) | | (825.38) |
| Other | 29,142.30 | (22,357.70) | (2,357.70) | (7,945.59) | 2,554.42 | (20,093.46) | (2,445.59) | (8,130.14) | 2,369.86 | (2,630.14) | (26,741.82) | (2,630.14) | (8,130.14) | (69,395.85) | | (762.59) |
| **Total Gross Profit** | 38,264.18 | 6,764.18 | 26,764.18 | 22,682.38 | 21,936.88 | 10,534.51 | 28,182.38 | 25,660.62 | 36,160.62 | 18,889.80 | 7,048.95 | 31,160.62 | 25,660.62 | 299,709.92 | 14.6% | 3,293.52 |
| | | | | | | | | | | | | | | | |
| **Operational Expenses- Enter as a (-)** | | | | | | | | | | | | | | | |
| *Labor Expenses* | | | | | | | | | | | | | | - | |
| Payroll + Fee's & Benefits & Taxes | (500.00) | (500.00) | (60,074.29) | (635.00) | (48,307.01) | (500.00) | (47,646.85) | (635.00) | (705.00) | (48,146.85) | (500.00) | (42,723.88) | (840.00) | (251,713.87) | (2,766.09) |
| Other - Labor | - | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| *Subtotal Labor Expenses* | (500.00) | (500.00) | (60,074.29) | (635.00) | (48,307.01) | (500.00) | (47,646.85) | (635.00) | (705.00) | (48,146.85) | (500.00) | (42,723.88) | (840.00) | (251,713.87) | (502,427.75) |
| | | | | | | | | | | | | | | | |
| *Corporate Expenses* | | | | | | | | | | | | | | | |
| Travel | - | - | - | - | - | (250.00) | - | - | - | - | (1,250.00) | (1,250.00) | (1,250.00) | (4,000.00) | (43.96) |
| E-Mail Marketing Platform | (17,000.00) | | | | (17,000.00) | | | | | (17,000.00) | | | | (51,000.00) | (560.44) |
| Affiliate Marketing Tracking Platform Hosting | (2,000.00) | | | | (2,000.00) | | | | | (2,000.00) | | | | (6,000.00) | (65.93) |
| Affiliate Tools Hosting | (850.00) | | | | (850.00) | | | | | (850.00) | | | | (2,550.00) | (28.02) |
| VoIP Phone Service | (150.00) | | | | (150.00) | | | | | (150.00) | | | | (450.00) | (4.95) |
| Advertising/Marketing | (1,373.00) | (2,500.00) | (3,000.00) | (1,000.00) | (5,721.00) | (2,500.00) | (3,000.00) | (1,000.00) | (5,348.00) | (2,873.00) | (3,000.00) | (1,000.00) | (5,348.00) | (37,663.00) | (413.88) |
| Credit Card Payments | | | | | | | | | | | | | | - | |
| Sales Tax Collected | 4,108.85 | 3,898.85 | 3,898.85 | 4,098.29 | 4,248.29 | 4,098.29 | 4,098.29 | 4,517.12 | 4,667.12 | 4,517.12 | 4,517.12 | 4,517.12 | 4,517.12 | 55,702.38 | 612.11 |
| Sales Tax Remitted | (16,070.00) | | | (16,004.82) | | | | (16,961.98) | | | | (18,218.46) | | (67,255.26) | (739.07) |
| Rent | - | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| Sublease Income | - | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| Software | (9,326.00) | (705.00) | (1,215.00) | (352.00) | (7,715.00) | (804.00) | (1,195.00) | (352.00) | (15.00) | (5,385.00) | (1,614.00) | (103.00) | (264.00) | (29,045.00) | (319.18) |
| Bank Fee | (500.00) | | | | | | (500.00) | | | | (500.00) | | | (1,500.00) | (16.48) |
| Administrative Expenses | (470.00) | (25.00) | (200.00) | (750.00) | (470.00) | (25.00) | (200.00) | (450.00) | (470.00) | | (250.00) | | (650.00) | (3,960.00) | (43.52) |
| GL Insurance - State Farm | - | - | - | - | (1,926.00) | - | - | - | (1,926.00) | | - | - | (1,926.00) | (5,778.00) | (63.49) |
| *Subtotal Corporate Expenses* | (43,130.16) | 168.85 | (516.16) | (14,008.54) | (31,583.71) | 269.29 | (546.71) | (14,246.86) | (3,091.88) | (23,740.88) | (2,096.88) | (16,054.35) | (4,920.88) | (153,498.88) | (1,686.80) |
| | | | | | | | | | | | | | | | |
| **Total Operational Expenses** | (43,630.16) | (331.16) | (60,590.44) | (14,643.54) | (79,890.72) | (230.71) | (48,193.56) | (14,881.86) | (3,796.88) | (71,887.73) | (2,596.88) | (58,778.23) | (5,760.88) | (405,212.76) | (4,452.89) |
| | | | | | | | | | | | | | | | |
| **Total Operating Net Income** | (5,365.98) | 6,433.02 | (33,826.27) | 8,038.85 | (57,953.84) | 10,303.80 | (20,011.18) | 10,778.76 | 32,363.74 | (52,997.93) | 4,452.06 | (27,617.61) | 19,899.74 | (105,502.84) | -5.1% | (1,159.37) |
| | | | | | | | | | | | | | | | |
| **Chapter 11 - Professional Fees & Costs** | | | | | | | | | | | | | | | |
| Investment Banking | (5,000.00) | (5,000.00) | (5,000.00) | (2,500.00) | (2,500.00) | (2,500.00) | (2,500.00) | (2,500.00) | (2,500.00) | - | - | - | - | (30,000.00) | (329.67) |
| Fennemore Craig | - | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| Mac Restructuring | - | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| Committee Counsel (if applicable) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| U.S. Trustee Fee | - | - | - | - | - | - | - | (4,875.00) | - | - | - | - | - | (4,875.00) | (53.57) |
| **Total Chapter 11 - Professional Fees & Costs** | (5,000.00) | (5,000.00) | (5,000.00) | (2,500.00) | (2,500.00) | (2,500.00) | (2,500.00) | (7,375.00) | (2,500.00) | - | - | - | - | (34,875.00) | (383.24) |
| **DIP LOAN** | | 100,000.00 | | | | | | | | | | | | 100,000.00 | 1,098.90 |
| **Ending Cash Balance** | $ 111,144.95 | $ 212,577.97 | $ 173,751.70 | $ 179,290.55 | $ 118,836.71 | $ 126,640.51 | $ 104,129.33 | $ 107,533.09 | $ 137,396.83 | $ 84,398.90 | $ 88,850.96 | $ 61,233.35 | 81,133.09 | $ 81,133.09 | 891.57 |

17,846.46 Min Sales a

t 25%